**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| **BETH MCGEE,** § | |
| § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 3:13-CV-01313-BH |
| § | |
| **CAROLYN W. COLVIN, ACTING** § | |
| **COMMISSIONER OF THE SOCIAL** § | |
| **SECURITY ADMINISTRATION,** § | |
| § | |
| **Defendant.** § | |

**MEMORANDUM OPINION AND ORDER**

Pursuant to the order of transfer filed July 30, 2013 (doc. 13), this case has been transferred for the conduct of all further proceedings and the entry of judgment. Based on the relevant filings, evidence, and applicable law, the final decision of the Commissioner is **AFFIRMED**.

**I. BACKGROUND[1]**

**A.   Procedural History**

Plaintiff Beth Jane McGee (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying her claims for disability income benefits under Title II of the Social Security Act. (R. at 1-3.) On March 31, 2010, she applied for disability insurance and supplemental security income benefits, alleging disability beginning September 6, 2006. (R at 132.) Her claims were denied initially and upon reconsideration. (*Id.*) Plaintiff timely requested a hearing before an Administrative Law Judge (ALJ), and personally appeared and testified at a hearing held on November 3, 2011. (R. at 44-58.) On December 27, 2011, the ALJ issued a decision finding her not disabled. (R. at 21-37.) Plaintiff appealed, and the Appeals

---

[1] The background information is summarized from the record of the administrative proceedings, which is designated as "R."

Council denied her request for review, making the ALJ's decision the final decision of the Commissioner. (R. at 1-2.) Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

**B.    Factual History**

    **1.    Age, Education, and Work Experience**

Plaintiff was born on December 8, 1958. (R. at 35.) At the time of the hearing before the ALJ, she was 52 years old. (R. at 35, 44.) She completed high school and has an associate's degree in paralegal studies. (*Id.*) Her past work includes jobs as a sales clerk, paralegal, retail store manager and cafeteria attendant. (R. at 45-46.)

    **2.    Medical Evidence**

        *a.    Physical Evidence*

On August 23, 2006, Plaintiff visited Dr. Joshua Greenstein in Escondido, California, and reported weakness, nausea, diarrhea, blurred vision, and hand numbness. (R. at 246.) She saw him again on September 7, 2006, for nausea, anxiety, and work-related stress. (R. at 245.) On September 26, 2006, Plaintiff saw Dr. Greenstein and reported suffering from anxiety. (R. at 244.) She visited him on December 1, 2006, complaining of a three-month flu. (R. at 243.)

On February 16, 2007, Plaintiff visited Dr. John J. Lilley. (R. at 242.) She claimed that she sustained facial injuries while interacting with her daughter's dog and complained of increased drainage, irritation, and cough. (*Id.*) She also mentioned multiple prior nasal fractures. (*Id.*) The lab results were unremarkable; the plain film of the frontal bones was not fractured and only soft tissue swelling was noted. (R. at 251.)

On March 19, 2007, Plaintiff visited Dr. Greenstein for a rash. (R. at 241.) Her blood pressure was 118/76. (*Id.*) She saw him again on June 20, 2007, and reported having leg pain. (R.

at 240.)  Dr. Greenstein diagnosed her as having restless leg syndrome.  (R. at 240.)

On August 27, 2007, Plaintiff was referred to Dr. Bassem Georgy for a CT brain scan due to her clinical history of headaches and nausea.  (R. at 248.)  The CT scan results were negative, showing no evidence of intra or extra axial mass lesion, hemorrhage or acute stroke.  (*Id.*)  The findings also included no evidence of significant white matter disease, and Plaintiff's ventricular system and basal cisterns were within the normal limits for her age.  (*Id.*)

On January 28, 2008, Plaintiff visited Dr. Greenstein for a ganglion cyst on her left wrist.  (R. at 237-238.)  He recommended she consult a hand surgeon.  (*Id*.)  On March 3, 2008, Plaintiff again visited Dr. Greenstein for a sore throat.  (R. at  237.)

On May 23, 2008, Plaintiff visited Dr. Robert S. Warren for an assessment of whether she had compressive neuropathy and polyneuropathy in her wrists.  (R. at 233.)  Testing revealed mildly abnormal median nerves in both wrists, although the right wrist was more abnormal than the left.  (*Id*.)  Dr. Warren reported that such abnormalities were not uncommon in patients who have had carpal tunnel surgery.  (R. at 235.)  The test revealed few findings that were compatible with axonal neuropathy.  (*Id*.)

On July 12, 2010, Dr. Farooq Hassan conducted an internal medicine evaluation and reported that Plaintiff had chronic pain syndrome, neck pain, leg pain, restless leg syndrome, hip pain, back pain, diabetes mellitus, depression, and anxiety syndrome.  (R. at 301-02.)  He also reported that Plaintiff appeared sick and fatigued.  (R. at 303.)

On August 24, 2008, Plaintiff visited Dr. Richard R. Ozmun for lumbosacral spine, shoulder, and knee x-rays.  (R. at 304.)  He found severe disc narrowing at L4-5 with moderate facet arthropathy at L4-5 and L5-S1.  (*Id.*)  Her left shoulder and right knee x-rays were unremarkable and grossly unremarkable, respectively.  (R. at 306-07.)

3

On September 13, 2010, Plaintiff saw Dr. Robert Gilliland for completion of a Psychiatric Review Technique Form (PRT). (R. at 323.) He found that she suffered from dysthymic disorder. (R. at 326.) His entries on the PRT form specifically stated that Plaintiff had "mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation" in work or work-like activities. (R. at 333.) He noted that she "performs routine household chores with frequent rest periods" and that she "reported that she maintains a number of active friendships." (R. at 335.) Dr. Gilliland also noted that Plaintiff's "alleged limits due to symptoms are not wholly supported by evidence in the file." (R. at 335.) He recommended that Plaintiff undergo a Residual Functioning Capacity (RFC) assessment. (R. at 323.) The PRT reported that Plaintiff could understand, remember, and carry out detailed but not complex instructions. (R. at 339.) It also noted that she could make decisions, attend and concentrate for extended periods, accept instructions, and respond appropriately to changes in routine work settings. (*Id.*)

On September 20, 2010, Plaintiff saw Dr. Jeanine Kwun, a State Agency medical expert, for an assessment of her RFC. (R. at 341.) Dr. Kwun reported that Plaintiff could occasionally lift and carry up to 20 pounds; frequently lift and carry up to 10 pounds; stand, walk, and sit for six hours in an eight-hour workday; and was not limited in her ability to push or pull with her hands or feet. (R. at 342.) Dr. Kwun also reported that Plaintiff's hip joint and knee joint had stiffness, reduced range of motion, and pain on active motion, but there was no redness, heat, crepitation, swelling, or effusion. (R. at 348.) Plaintiff showed no Romberg's sign, waddling gait, drunken gait, foot drop, or use of a cane, and she had no difficulty tandem walking, walking on toes, hopping, squatting, or arising from a squatting position. (*Id.*) Dr. Kwun also reviewed Plaintiff's August 24, 2010 x-rays. (*Id.*) They showed no abnormalities to Plaintiff's left shoulder and right knee but did

4

reveal severe disc narrowing. (*Id.*) Lastly, Dr. Kwun reported that Plaintiff's alleged limitations were partially supported by evidence in the file. (*Id.*)

### b.     *Psychological Evidence*

On September 25, 2006, Plaintiff visited Dr. Eric Drimmer. (R. at 286-91.) She underwent an initial evaluation and was proscribed Lexapro. (R. at 290.) She saw him again on November 1, 2006. (R. at 284.) He reported that she showed slight improvement with the increased Lexapro, but complained of low motivation, low energy, lack of interest, and a lack of enjoyment in usual activities. (R. at 285.) Dr. Drimmer discontinued prescribing Lexapro because Plaintiff's insurance no longer covered it and instead prescribed 20 mg of Prozac. (*Id.*) On November 22, 2006, Plaintiff returned to Dr. Dimmer for her depressive symptoms. (R. at 284.) He increased her Prozac dosage to 40 mg because she showed no signs of significant improvement. (*Id.*) She saw him again on December 13, 2006, and reported that she was sleeping better and that her energy levels had increased. (R. at 283.)

On January 3, 2007, Plaintiff again visited Dr. Drimmer for her regular psychiatric evaluation. (R. at 282.) He reported that she had taken 70 to 75% control of her depressive symptoms, and that she lost a few pounds and was going to the gym. (*Id.*) Plaintiff saw him again on January 31, 2007. (R. at 281.) She reported that her house had undergone major reconstruction due to a water main break, and that she needed to relocate her mother, who suffered from Alzheimer's disease. (*Id.*) Plaintiff's depressive symptoms included tearfulness, loss of energy, low motivation, irritability, and poor concentration. (*Id.*)

On March 5, 2007, Plaintiff again visited Dr. Drimmer. (R. at 280.) She reported that her depression had significantly improved since her last visit, and she showed good energy. (*Id.*) Additionally, Plaintiff had settled her mother into a new residence, and most of the damage to her

home was almost completely repaired. (*Id.*) She returned to Dr. Zimmer on April 9, 2007. (R. at 279.) Her depression was reasonably under control, and she was contemplating looking for new employment. (*Id.*) On May 15, 2007, she reported an increase in depressive symptoms due to recurring marital problems. (R. at 278.) She had started looking for employment, however, and was hopeful for interviews. (*Id.*)

On June 5, 2007, Plaintiff visited Dr. Drimmer, reporting that her depression was improving due to the increase in Prozac. (R. at 277.) She described constantly forgetting and misplacing items. (*Id.*) Dr. Drimmer evaluated Plaintiff for ADD through a rating scale. (*Id.*) Plaintiff returned to him on July 10, 2007. (R. at 272.) She was reportedly depressed three to four days a week and found it difficult to leave her room. (*Id.*) Dr. Drimmer noted that Plaintiff's ADD rating scale revealed evaluations on most scales. (*Id.*) He recommended the possible use of stimulants to treat her ADD, and he also augmented her antidepressants. (*Id.*) On July 31, 2007, Plaintiff reported a slight improvement in her depressive symptoms. (R. at 271.) However, assessing her depression was difficult due to her marital problems. (*Id.*) On August 21, 2007, Dr. Drimmer discontinued Metadate and started Plaintiff on 150 mg of Wellbutrin. (R. at 270.) He noted that she showed signs of decreased energy, motivation, and hypersomnia of up to 19 hours. (*Id.*)

On October 1, 2007, Plaintiff returned to Dr. Drimmer for another psychiatric evaluation. (R. at 268.) She complained that she was struggling with memories of an alcoholic stepfather. (*Id.*) Plaintiff had been terminated from her job at Blockbuster Video. (*Id.*) She had hypersomnia on weekends, and she continued to have significant depressive symptoms despite the use of Wellbutrin. (*Id.*) On November 9, 2007, Plaintiff reported that she was crying more but seemed to be more productive in general. (R. at 268.) On December 7, 2007, she reported stress resulting from the illness of her mother and a close friend. (*Id.*)

6

After a visit on March 4, 2008, Dr. Drimmer concluded that Plaintiff was controlling her depression. (R. at 266.) At a follow-up evaluation on August 12, 2008, Plaintiff reported having a difficult time dealing with the recent deaths of her mother, sister, and a close friend. (R. at 265.) Dr. Drimmer found that Plaintiff was not suicidal and recommended an increase in Wellbutrin to two 450 mg per day. (*Id.*)

On June 29, 2010, Dr. J. Lawrence Muirhead, a clinical psychologist, conducted a psychological evaluation and diagnosed Plaintiff with dysthymic disorder and dyssomnia. (R. at 294-96.) He noted that she had a history of chronic insomnia, weeping spells, compromised frustration tolerance, and consistent low energy levels. (*Id.*) He also noted that Plaintiff's depression centered around unemployment, financial difficulties, unresolved grief following the deaths of two family members, and chronic pain syndrome. (*Id.*)

### 3. Hearing Testimony

On November 3, 2011, Plaintiff, a vocational expert (VE), and a medical expert (ME) testified at a hearing before the ALJ. (R. at 44-66.) Plaintiff was represented by an attorney. (R. at 44.)

#### a. *Plaintiff's Testimony*

Plaintiff testified that she was fifty-two years old. (R. at 44.) She graduated from high school and obtained an associate's degree in paralegal studies. (R. at 45.) She previously worked as a cook and a line attendant for Quinlan ISD, but only a few times during the week as needed. (*Id.*) She also tried working at Wal-Mart but was only employed there for two months. (*Id.*) From 2001 to 2006, she worked as a store manager for Blockbuster Video, and before that, as a paralegal for Litigation Support Company. (*Id.*) She stopped working as a paralegal because she wanted to

7

work with the public again. (*Id.*)

Plaintiff had a history of neck and back issues even after having surgery for a ruptured disk. (R. at 46.) Her back pain was so severe that it would sometimes stop her in mid-stride when she walked. (*Id.*) She also had tingling and numbness across her shoulders, which limited the use of her arms so much that she could not finish folding a full load of laundry. (*Id.*) Plaintiff had restless leg syndrome, for which she was taking medication. (*Id.*) Her right hip and right knee would occasionally give out on her, and she could not walk further than half a block. (R. at 51.) Plaintiff also testified that she had neuropathy caused by diabetes. (*Id.*) She was not able to afford the strips to test her blood sugar, however. (R. at 47.) Her neuropathy resulted in the occasional "hot jolt" or throbbing sensations in her legs. (R. at 51.) She also had fibromyalgia. (R. at 49.) She felt the pain all over her body. (*Id.*) She had carpal tunnel surgery on both hands and two ganglion cyst surgeries on her left hand. (*Id.*) The latter surgeries had weakened her hands to the point that she could not lift a gallon of milk. (*Id.*) Her husband took care of most of the house chores and the shopping. (R. at 52.) When Plaintiff did go shopping, she went in the middle of the night in order to avoid people. (*Id.*)

Plaintiff also had problems with depression and anxiety due to her inability to socialize with others. (R. at 47.) She believed this limitation, which started in 2006, also caused her termination from Blockbuster because she could no longer be around people for long periods of time. (R. at 48.) She had problems taking care of her hygiene because she did not have full mobility of her arms. (R. at 55.) Her husband sometimes helped her shower. (*Id.*)

      b.     *ME's Testimony*

The ME testified that Plaintiff had been diagnosed with dysthymic disorder but had been

8

doing well on her medication. (R. at 58.) Plaintiff's depression was related to martial problems, and the events leading up to and the deaths of her mother, her sister and a friend. (R. at 58-59.) He opined that Plaintiff would not meet a mental health listing based on the record despite Dr. Muirhead's diagnosis of dysthymia. (R. at 59.) The ME considered that Plaintiff only had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate limitations maintaining concentration. (*Id.*) Her review of the record revealed that Plaintiff was around people even though she claimed she was unable to be around others. (*Id.*) She noted that work in school cafeterias require social interaction. (*Id.*)

Based on her review of Plaintiff's mental impairments, the ME restricted her to "complex or detailed job instructions" and "superficial contact with the public." (R. at 59-60.) Plaintiff had "no problem with contact with coworkers." (*Id.*) Her review of the record revealed no episodes of decompensation since the alleged onset date. (*Id.*) The ME also claimed that Plaintiff had only a "mild limitation based on the fact that she is able to work part-time" and to take care of her "basic needs." (R. at 59.)

    *c.*  *VE's Testimony*

The VE testified that Plaintiff's past relevant work history included jobs as a sales clerk (light, skill level three, DOT 290.477-014), paralegal (light, skill level seven, DOT 119.267-026), retail store manager (light, skill level seven, DOT 185.167-046), and as a cafeteria attendant (light, skill level two, DOT 311.677-010). (R. at 61.) The ALJ asked the VE to opine whether a hypothetical person with the same residual functional capacity, age, education, and work experience as Plaintiff could perform her past relevant work with the following limitations: sit, stand, and /or walk for six hours in an eight hour workday; no limits in pushing and pulling; never climb ladders,

9

ropes, scaffolds; occasionally climb ramps and stairs; and balance. (R. at 61-62.) The VE opined that the hypothetical person could not perform Plaintiff's past relevant work because of the level of public contact and detailed work demanded by those jobs. (R. at 61.)

The ALJ next asked the VE whether there were jobs existing in significant numbers in the national economy that a hypothetical person with Plaintiff's same residual capacity, age, education, and experience could perform. (R. at 61-62.) The VE testified that the hypothetical person could perform some light and unskilled occupations, such as a housekeeper (light, SVP–2, DOT 239.567-010), with 7,900 jobs in Texas and 114,000 jobs in the national economy; assembler of small products (light, SVP–2, DOT 706.684-022), with 12,000 jobs in Texas and 200,000 jobs in the national economy; and a baker worker in a conveyor line (light, SVP–2, DOT 524.687-022), with 12,100 jobs in Texas and 220,000 jobs in the national economy. (R. at 62.) The VE opined that the Plaintiff would not be competitive at those jobs if she was having difficulty completing a normal workday or workweek without significant interruption from her mental health issues or without exhibiting emotional extremes. (*Id.*) In response to a question by the ALJ, the VE stated that her testimony was consistent with the jobs as described in the dictionary of occupational titles (DOT). (R. at 63.)

Plaintiff's attorney alluded to Plaintiff's inability to be around people three to four days out of the week and asked whether this limitation would render Plaintiff unable to perform a normal workweek. (*Id.*) The VE stated that Plaintiff could not maintain employment for long since such a limitation would lead to an inexcusable amount of absences. (*Id.*)

**C.    ALJ's Findings**

The ALJ denied Plaintiff's application for benefits by written opinion issued on December

27, 2011. (R. at 21-41.) At step 1, the ALJ found that Plaintiff met the insured status requirements through September 30, 2012, and had not engaged in substantial gainful activity since September 6, 2006, her alleged onset date. (R. at 26.) At step 2, the ALJ found that Plaintiff's diabetes mellitus, restless leg syndrome, lumbar pain, shoulder tenderness, fibromyalgia, and dysthymic disorder qualified as severe impairments. (*Id.*) At step 3, the ALJ found that Plaintiff did not have a severe impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 29.) At step 4, the ALJ found that Plaintiff had the physical residual functional capacity to lift 20 pounds occasionally; frequently lift and/or carry up to 10 pounds; and walk, sit and stand in an 8 hour work day. (R. at 31.)

The ALJ found that Plaintiff's statements about her pain and other symptoms were not conclusive evidence of disability. (R. at 32.) The ALJ stated that these statements needed to be corroborated with medical findings showing the existence of a medical impairment that resulted from anatomical, physiological abnormalities that could reasonably be expected to produce the pain or other symptoms alleged. (*Id.*) Based on a lack of medical findings, the ALJ found that Plaintiff's most serious symptoms were outside the range of reasonable attribution according to the medical opinions of record, and that the medically determinable impairments could therefore not reasonably be expected to produce the symptoms to the alleged degree. (R. at 33-34).

## II. ANALYSIS

**A.    Legal Standards**

    **1.    Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g), 1383(C)(3). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* Thus, the Court may rely on decisions in both areas without distinction in reviewing an ALJ's decision. *Id.*

### 2. Disability Determination

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). The Commissioner utilizes a sequential five-step inquiry to determine whether an adult is disabled and entitled to benefits under the Social Security Act:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f) (currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-

step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.    Issue for Review:**

Plaintiff presents the following issue for review:

> The regulations describe a two-step process for evaluating symptoms, such as pain and fatigue: Is there a medically determinable impairment that could reasonably be expected to produce the symptoms? If so, the intensity, persistence, and limiting effects of the symptoms are evaluated. The ALJ in [Plaintiff's] case stopped his analysis at step one because he found her impairments could not produce the "severity" of her symptoms. Does the ALJ's incorrect standard justify reversal?

(Pl. Br. at 17.)[2]

**C.    Credibility**

Plaintiff contends that the ALJ failed to make adequate credibility findings regarding her complaints of pain as required by SSR 96-7p. (Pl. Br. at 17-20.) She claims that he applied an improper legal standard that required her to prove that her impairments produced "the degree of pain" of which she complained and that accepted only objective medical evidence as proof. (*Id.* at 18, 20.) She also contends that ALJ did not explicitly consider the seven factors listed in SSR 96–7p. (*Id.* at 19-20.)

Credibility determinations by an ALJ are entitled to deference. *See Carrier v. Sullivan*, 944 F.2d 243, 247 (5th Cir.1991). The ALJ is in the best position to assess a claimant's credibility since the ALJ "enjoys the benefit of perceiving first-hand the claimant at the hearing." *Falco v. Shalala*, 27 F.3d 164 n. 18 (5th Cir.1994). In evaluating a claimant's subjective complaints, the ALJ must follow a two-step process. SSR 96–7p, 1996 WL 374186, at *2 (S.S.A. July 2, 1996). First, the

---

[2] Citations refer to the cm/ecf system page number at the top of each page rather than the page numbers at the bottom of each filing.

14

ALJ must determine whether the claimant has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms. *Id.* Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the alleged symptoms to determine the extent to which they limit the individual's ability to do basic work activities. *Id.* If the claimant's statements concerning the intensity, persistence, or limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a credibility finding regarding the claimant's statements. *Id.*; *Falco,* 27 F.3d at 164 (citing *Scharlow v. Schweiker,* 655 F.2d 645, 648–49 (5th Cir.1985)).

In assessing credibility, the ALJ must consider the entire record, including medical signs and laboratory findings, and statements by the claimant and his treating or examining sources concerning the alleged symptoms and their effect. SSR 96–7p, 1996 WL 374186, at *2. The ALJ must also consider a non-exclusive list of seven relevant factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, for relief of pain or other symptoms; (6) measures other than treatment the claimant uses to relieve pain or other symptoms (e.g., lying flat on his or her back); and (7) any other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* at *3. Even though the Fifth Circuit does not require an ALJ to "follow formalistic rules" in assessing a claimant's subjective complaints, "the ALJ must articulate reasons for rejecting" any such complaints. *Falco*, 27 F.3d at 163-64. The ALJ's "determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific

15

to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id*.

Plaintiff contends that pain can be considered disabling, despite the absence of supporting medical evidence for the pain itself, if linked to a medically determinable impairment. (Pl. Br. at 20.) Not all pain is disabling, and subjective evidence need not be credited over conflicting medical evidence. *Jones v. Heckler*, 702 F.2d 616, 621 n. 4 (5th Cir.1983). At a minimum, objective medical evidence must demonstrate the existence of a condition that could reasonably be expected to produce the level of pain or other symptoms alleged. *Owens v. Heckler*, 770 F.2d 1276, 1281 (5th Cir.1985). In fact, 42 U.S.C. § 423(d)(5)(A) states "there must be medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques, which show the existence of a medical impairment . . . which could reasonably be expected to produce the pain . . . alleged[.]" *Id.*; *see also Selders v. Sullivan,* 914 F.2d 614, 618 (5th Cir.1990).

     **1.**     **Two-step Process**

Plaintiff argues that "the ALJ conclusively made his ruling at the first step of the pain analysis, and never proceeded to the second step." (Pl. Br. at 20.)

Here, the ALJ's written decision expressly states that he considered Plaintiff's symptoms in accordance with SSR 96-7p and 20 C.F.R. 404.1529. (R. at 31.) It also expressly identified the two-step process that the ALJ was required to follow. (R. at 31.) The decision then summarized Plaintiff's description of her symptoms. (R. at 32.) The ALJ acknowledged a link between her alleged symptoms and her medically determinable impairments:

> In this case, the claimant appears to be sincere and genuine regarding the pain and limitations she states she experienced with the medical impairments. If accepted as described however, the claimant would be prevented from completing even sedentary exertional functions. However, the claimant's most serious symptoms and

16

> limitations are simply outside the range of reasonable attribution according to the medical opinions of record. *Luna v. Bowen*, 834 F.3d 161, 164 n.3 (10th Cir. 1987) and *Loya v. Heckler*, 707 F.2d 211, 214 (5th Cir. 1983). As indicated hereinafter, the medically determinable impairments cannot reasonably be expected to produce the symptoms to the degree alleged by the claimant.

(R. at 33-34.) He stated his ultimate determination that Plaintiff's allegations of her symptoms were not credible and proceeded to discuss, albeit somewhat briefly, the medical opinions upon which he relied to reach that determination. (R. at 35.)

The ALJ noted that the record did not contain any opinions from a treating or examining source, and he referenced Dr. Farooq Hassan's July 12, 2010 consultative physical examination. (R. at 34, 27.) Plaintiff alleged she suffered from tingling and numbness between her shoulders, but Dr. Hassan's report showed that her shoulder joints had no redness, stiffness, crepitation, swelling, decreased range of motion, and no pain on active or passive motion. (R. at 27, 302.) Although Plaintiff complained of standing, sitting, and right knee pain when walking, the ALJ noted Dr. Kwun's opinion, which stated that Plaintiff's hip and knee joints showed no redness, swelling, or crepitation, but they had stiffness, decreased range of motion, and pain on active and passive motion. (R. at 34, 348.) Dr. Kwun also found that Plaintiff could occasionally lift and carry up to 20 pounds, frequently lift and carry up to 10 pounds, stand, walk, and sit for six hours in an eight-hour work day, and was not limited in her ability to push or pull with her hands and feet. (R. at 34, 342.) The ALJ had previously noted that Plaintiff's x-rays on her left shoulder and right knee were unremarkable, her x-ray on the lumbar spine showed "pedicles at all [] levels[,]" with severe disc narrowing resulting in moderate facet arthropathy, but with preserved vertebral body heights and lumbar lordosis. (R. at 27-28.)

The ALJ also observed that no differential psychological testing was produced to quantify

the severity of the Plaintiff's alleged psychological impairments. (R. at 34.) Regarding Plaintiff's medically determinable mental health impairments, he noted the ME's testimony that Plaintiff had received psychiatric treatment and was doing well on medication. (*Id.*) The ALJ took into account that Plaintiff's depression was caused by marital problems and the deaths of several people close to her. (*Id.*) He found inconsistencies between Plaintiff's testimony and other evidence in the record, including her previous statements, however. (R. at 33-34.) For instance, she testified that she stopped working at one job due to her increasing difficulty to interact with others, but she was working at a school cafeteria at the time of the hearing. (R. at 34-35.) The ALJ also noted that the medical evidence showed that Plaintiff experienced some lapses in concentration but was still able to perform detailed work and tasks. (R. at 34-35.)

As noted, the ALJ ultimately determined that Plaintiff's allegations of her symptoms were not credible to the extent they were inconsistent with the medical opinions and other evidence. (R. at 35.) His conclusion specifically stated that he had considered these medical opinions as well as Plaintiff's statements about the intensity, persistence, or functionally limiting effects of her symptoms on her ability to do basic work activities:

> After careful consideration of the medical opinions of record, I find that the claimant's medically determinable impairments cannot reasonably be expected to produce the symptoms to the degree alleged by the claimant. The claimant's statements concerning the intensity, persistence and limiting effects of these symptoms have been determined to diminish the capacity for basic work activities only to the extent to which they can reasonably be accepted as consistent with the objective medical and other evidence. 20 CFR § 1529(c)(4).

(R. at 35.) Although more clarity and detail would have been helpful, the ALJ's decision shows that he did proceed to the second step of the credibility analysis.

18

### 2. Seven-factor Test

Plaintiff also argues that the ALJ did not apply the seven factors listed in SSR 96-7p. (Pl. Br. at 19-20, 25.)

The ALJ addressed several of the non-exclusive credibility factors listed in SSR 96-7p in assessing Plaintiff's credibility. (R. at 32, 34.) He discussed her description of her daily activities, the first factor, and found that she only had mild limitations in her ability to perform daily activities because she cared for her "basic needs" and was employed. (*Id.*) The ALJ also addressed the second factor, i.e., the duration, frequency, and intensity of Plaintiff's allegations of her back pain, shoulder and neck numbness and tingling, and her knee issues. (*Id.*) He considered her testimony that her legs went numb when she sat longer than 10-15 minutes and that lifting and carrying aggravated her pain, which goes to the third factor. (*Id.*) The ALJ noted the testimony of the ME that Plaintiff had "received psychiatric treatment and was doing well on medication[,]" which is part of the fifth factor. (R. at 34.) He also addressed other factors, such as her inability to socialize, and being irritated when working around others. (R. at 32.)

As noted, the Fifth Circuit has explicitly rejected the requirement that an ALJ "follow formalistic rules" when assessing a claimant's subjective complaints of pain. *Falco,* 27 F.3d at 164. Although not in a formalistic fashion, the ALJ considered the factors for assessing credibility and relied on substantial evidence, including objective medical findings and Plaintiff's own statements, to support his credibility determination. Because a review of the ALJ's credibility assessment reveals that he addressed the applicable factors outlined in SSR 96-7p, remand is not required.

### III. CONCLUSION

The final decision of the Commissioner is **AFFIRMED**.

19

**SO ORDERED** on this 30th day of September, 2014.

_____
IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE